# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

STEVEN DISBRO,

                                        Plaintiff,

            v.                                          3:17-CV-335 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
REBECCA H. ESTELLE, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

On October 15, 2013, plaintiff filed applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"), alleging disability beginning August 1, 2012. (Administrative Transcript ("T.") at 86, 87, 263-69, 270-76). Plaintiff's claims were denied initially on December 12, 2013, and he made a timely request for a hearing before an Administrative Law Judge ("ALJ"). (T. 101-103).

ALJ John P. Ramos conducted a hearing on June 29, 2015, at which plaintiff testified. (T. 28-49). ALJ Ramos held a supplemental hearing on September 22, 2015 in order to obtain the testimony of a Vocational Expert ("VE"). (T. 50-65). In a

decision, dated September 24, 2015, ALJ Ramos found that plaintiff was not disabled from his alleged onset date through the date of the ALJ's decision. (T. 8-27). The ALJ's decision became the decision of the Commissioner when the Appeals Council denied plaintiff's request for review on January 19, 2017. (T. 1-3).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is

> whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   <u>FACTS</u>

At the time of the hearing, plaintiff was 48 years old. (T. 32). He finished college and earned a Bachelor of Arts degree in Anthropology. (*Id.*) His most recent past relevant work was as a substitute teacher, a janitor, and a waiter. (T. 32-36). Plaintiff had jobs substitute teaching, waiting tables, and cleaning offices during the time after his August 1, 2012 disability onset date. (*Id.*) Plaintiff testified that in 2003, he worked for New York State ARC[1] as an "enclave supervisor," which involved supervising a group of disabled adults, who were sent to work at "L3

---

[1] NYS ARC has been renamed "The ARC." Originally the letters ARC stood for the Association for Retarded Citizens. https://www.ahrcnyc.org/news/nysarc-changes-name-arc-new-york/

4

Communications." (T. 36).  Plaintiff's job was to keep the workers "on task." (T. 36-37).  Plaintiff states that the ARC job ended because the contract with L3 Communications ended, and plaintiff was not offered another position. (T. 37-38).  Plaintiff also had experience as a delivery person with Bauer Radiator, but that job ended because the company closed. (T. 38).

Plaintiff testified that his most recent job was with Catholic Schools of Broome County in the 2014-15 school year. (T. 33-34).  Plaintiff was not sure that the school was going to hire him again because he had not been called to work there since "the middle of May."[2] (T. 34).  Plaintiff testified that the Johnson City School District simply stopped offering him work, and that he was "fired" from his position at the Binghamton School District. (T. 35).  Plaintiff stated that in 2013, he was fired from a restaurant position because he could not "handle the memory." (T. 34-35).

Plaintiff testified that until February of 2015, he was being treated by Peggy Bright-Berhannan, a counselor at the Lourdes Family Health Clinic. (T. 38).  He was seeing Counselor Bright-Berhannan for depression and anxiety. (*Id.*)  Plaintiff stated that he stopped seeing Counselor Bright-Berhannan because he began seeing Licenced Certified Social Worker ("LCSW"), Theresa Dearie at Samaritan Counseling. (T. 38).  Plaintiff testified that he had been seeing LCSW Dearie every week for "around a year, maybe a little more." (*Id.*)  Plaintiff testified that LCSW Dearie was "a lot more helpful" than Counselor Bright-Berhannan. (*Id.*)

The ALJ asked plaintiff why he applied for Social Security Benefits. (T. 39).

---

[2] As stated above, plaintiff's hearing was in June 29, 2015.

Plaintiff stated that he spent his life being "chronically unemployed,"[3] and he could not keep a job. (T. 39). Plaintiff testified that he was fired from working at all the Radio Shacks in the area. (T. 39). Plaintiff stated that he could not get along with people, and some employers told him that he did not have "enough personality." (*Id.*) Plaintiff noted that he had been recently diagnosed with Autism, which "ma[de] sense" because he always knew there was something wrong with him. (T. 40). Plaintiff stated that he had trouble concentrating, and if he had to focus on something for more than a few minutes he became nauseated and dizzy. (*Id.*)

Plaintiff described these symptoms by explaining that he was trying to help his mother set up her "Wi-Fi" with Time Warner, and after fifteen minutes, he became so ill that he had to lie down for a "couple of hours" before he could leave her home.[4] (*Id.*) Plaintiff even had trouble setting up a "Play Station" that he was given. Plaintiff testified that he lost the janitorial job at Temco because he became sick from attending to simple tasks such as dusting a room or vacuuming the hallway. Plaintiff states that he went home sick so many times, the company fired him. (*Id.*) Plaintiff stated that one of "those times," he had to go to the ER, and he was sent home with a "heart monitor." (*Id.*)

Because plaintiff had been working as a substitute teacher a few months prior to the hearing, the ALJ asked plaintiff how he could manage a classroom full of students,

---

[3] This was the identical language used by Psychiatric Nurse Practititoner ("NPP") Kay Hooper in an evaluation dated November 29, 2012. (T. 442) ("He has been chronically unemployed or under employed and fears that he could be come homeless.") (*Id.*)

[4] Later during his testimony, plaintiff stated that in addition to helping his mother with her Wi-Fi, he also picked things up at the store and delivered them to her. (T. 47).

when he was unable to perform such simple tasks. (T. 40).  Plaintiff responded that "thankfully, Seton is a Catholic school," and that the Catholic school students were much better behaved than the public schools so that he did not have to deal with "behavioral issues."  In addition, plaintiff stated that his job at Seton only required him to hand out papers or tests and make sure the students completed their assignments. (T. 41).  Plaintiff also noted that the job at Seton was only a six-hour day, with sufficient breaks so that he did not have to concentrate on anything for too long. (T. 41).  During questioning by his attorney, plaintiff stated that he did not always work six-hour days at the school, nor did he work full days at his cleaning job. (T. 43-44).

Plaintiff testified that he spent his days taking walks, watching television, and reading. (T. 42).  Plaintiff stated that he did not do crossword puzzles any more, and he could only read "occasionally," and not for too long. (*Id.*)  Plaintiff stated that he also suffered from insomnia, but was taking no prescription medications for any of his mental impairments.[5] (T. 39, 42)  Plaintiff stated that the difficulty in getting along with others was probably related to his "speech." (T. 44).  He stated that "[t]hey probably think that I am not too empathetic . . . [,] they always thought I was kind of weird[, and] . . . I wasn't . . . just a great conversationalist." (*Id.*)  Plaintiff's attorney asked him whether his problem might be "getting his point across," to which plaintiff responded: "[s]ometimes, probably, yeah." (*Id.*)  Plaintiff testified that he did not really have any friends or co-workers with whom he socialized. (*Id.*)

Plaintiff testified that he suffered from panic attacks "sometimes once a week,"

---

[5] Plaintiff testified that he tried "Zzzquill" for his insomnia. (T. 45).  Plaintiff stated that the Zzzquill did not work. (*Id.*)

but he was not sure. (T. 45-46).  He did not know what caused these attacks, but they only happened when he had to do something with other people, "never, never when I'm at home." (T. 46).  Plaintiff stated that he had many panic or anxiety attacks when he was working at the Binghamton schools, and these attacks may have been part of the reason that he was fired from "some" of the school positions. (*Id.*)  Plaintiff testified that he took care of getting dressed, cleaning, laundry, and other daily activities, but then stated that he could not "emotionally" bring himself to do "it" now. (T. 47).

Plaintiff testified that when he worked at the janitorial service, he worked by himself and only saw his supervisor once a week or once every two weeks. (T. 47-48). Plaintiff stated that he had, at the time of the hearing, applied to work as a van driver for the summer at the Urban League and had applied other places, but could not remember where. (T. 48).  Plaintiff stated that he was required to apply for work or he would lose his Unemployment benefits. (*Id.*)

The defendant's brief and the ALJ's decision provide a detailed statement of the medical and other evidence of record. (Def.'s Mem. of Law at 2-10) (Dkt. No. 10) (T. 8-27).  Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.[6]

## IV.    ALJ'S DECISION

At Step 1 of the sequential evaluation, the ALJ determined, based upon

---

[6] The court need not summarize the testimony from plaintiff's second hearing, during which the ALJ took the VE's testimony.  The issue in this case relates only to the weight afforded to LCSW Dearie's report and whether the ALJ should have consulted an expert to determine whether plaintiff suffered from Autism.  If the ALJ's decision in this regard was supported by substantial evidence, then the RFC and hypothetical question posed to the VE were correct.

plaintiff's income during the period in question, that plaintiff engaged in substantial gainful activity ("SGA"). However, rather than denying plaintiff's applications at Step 1, the ALJ found that there had been "a continuous 12-month period during which the claimant did not engage in [SGA]," and therefore the ALJ decided to "address the remaining steps in the sequential evaluation." (T. 14). However, the ALJ did note that "the claimant's work activities after his alleged onset date will not be ignored when determining his ability to work." (*Id.*)

At Step 2 of the sequential evaluation, the ALJ found that plaintiff's depression, dysthymia, bereavement, posttraumatic stress disorder ("PTSD"), and personality disorder were "severe" impairments. (T. 14). The ALJ based this determination, in part, on the consultative report of Cheryl Loomis, Ph.D, dated December 2, 2013. (T. 14, 444-47). Although LSCW Dearie, had more recently diagnosed plaintiff with "autism spectrum disorder," the ALJ found that LCSW Dearie was not an "acceptable medical source" under the Social Security regulations who would be authorized to diagnose an impairment. (T. 14-15) (citing 20 C.F.R. §§ 404.1513(a), 416.913(a)). In addition the ALJ found that LCSW Dearie's treatment notes were not consistent with this diagnosis. (T. 15). Thus, the ALJ did not find plaintiff's alleged Autism to be a medically determinable impairment. (*Id.*) ALJ Ramos used the agency's "special technique" to evaluate mental impairments. (T. 15) (citing 20 C.F.R. §§ 404.1520(a), 416.920(a)).

Finally, with respect to plaintiff's physical impairments, the ALJ found that although plaintiff complained of syncope and irregular heartbeat, the emergency room records indicated that all diagnostic testing was "within normal limits." Thus,

plaintiff's physical impairments were not "severe." (T. 15).

At Step 3, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (T. 15-16). In making this determination, the ALJ considered the requirements found in Listings 12.04 (affective disorders); 12.06 (anxiety-related disorders); and 12.08 (personality disorders).[7] (T. 15). The ALJ repeated his rejection of LCSW Dearie's Autism diagnosis, but the ALJ did analyze plaintiff's condition with respect to the requirements of Listing 12.10 (autistic disorders), finding that Dr. Loomis's findings "contradict LCSW Dearie's conclusion that the claimant meets the requirement of the listings." (T. 15-16).

At Step 4, the ALJ found that plaintiff had the physical RFC to perform a full range of work at all exertional levels. (T. 16). With respect to his mental status, the ALJ found that plaintiff retained the ability to understand and follow simple instructions and directions; perform simple tasks with intermittent supervision and independently; maintain attention/concentration for simple tasks; and regularly attend to a routine and maintain a schedule. (*Id.*) However, plaintiff was limited to "brief, occasional, simple contact and interaction with any coworkers." He could "complete simple tasks without the need for frequent supervision and can interact with supervisors on an intermittent basis throughout the workday." He should have "no" contact with

---

[7] The ALJ also found that the evidence also failed to establish that plaintiff satisfied the "paragraph C" criteria of Listings 12.04 and 12.06. (T. 16). The ALJ found with respect to section 12.04, plaintiff did not demonstrate "repeated episodes of decompensation, each of extended duration." (T. 16). The ALJ also found that the evidence "clearly does not demonstrate" the requirements of the "paragraph C" criteria of Listing 12.06 because plaintiff does not have a "complete inability to function independently outside the area of his home." (T. 16).

the public, but could handle "reasonable levels of work-related stress in that he can
make simple decisions directly related to the completion of his tasks and deal with
standardized situations with occasional variables which he encounters on the job." (T.
16-17).

In making this determination, the ALJ accepted the majority of Dr. Loomis's
consultative opinion, except for her determination that plaintiff had "marked"
limitations for maintaining a regular schedule and appropriately dealing with stress. (T.
17).  The ALJ found that such limitations were "contradicted by his broad range of
daily activities," and the fact that plaintiff engaged in activities rising to the level of
SGA after Dr. Loomis rendered her opinion. (*Id.*)  The ALJ stated that he accounted for
plaintiff's limitations in social interaction by limiting plaintiff to "simple" work
activity, during which he only had "brief" interaction with co-workers and **no**
interaction with the public. (*Id.*)

In making his RFC determination, the ALJ also gave "some weight" to the
December 2013 opinion of Dr. Kleinerman, a non-examining, State Agency physician,
who reviewed the record in this case. (T. 17-18).  The ALJ relied upon Dr. Kleinerman,
based upon the doctor's "programmatic expertise," but also determined that the plaintiff
had "greater social limitations than Dr. Kleinerman identified" based upon plaintiff's
"reported panic attacks." (T. 18).  The ALJ repeated his rejection of LCSW Dearie's
opinions as "contradicted" by the objective evidence of record, including the findings
listed in her own contemporaneous treatment notes. (T. 18-19).  The ALJ found that
plaintiff's allegations of greater limitations and his subjective complaints "not fully

11

credible," based in part, on his own reports of his activity levels and his continuing to engage in substitute teaching as recently as March of 2015. (T. 19).

Notwithstanding his ability to function at a higher level than plaintiff claimed,[8] the ALJ found that plaintiff was unable to perform any of his past relevant work. (T. 19). The ALJ relied on the VE's testimony that plaintiff's past work activity as a substitute teacher and an "enclave supervisor" exceeded the RFC described in the ALJ's hypothetical question. (T. 19). Thus, the ALJ proceeded to Step 5 of the sequential evaluation. (T. 19-20). The ALJ relied upon the VE's testimony that, based upon the above RFC, plaintiff would be able to perform three "representative" occupations, including Marker II, Small Products Assembler, and Mail Clerk. (T. 20). The ALJ found that plaintiff's "ongoing work activity" belied his claim that he was limited to no "fast-paced work," no production rates, no quotas, no supervision of others, no conflict resolution, no responsibility for the safety of others, and would occasionally respond inappropriately to supervisors or co-workers.[9] (*Id.*)

The ALJ found that, based on the VE's testimony, and considering plaintiff's age education, work experience, and RFC, plaintiff would be able to made a successful adjustment to other work that existed "in significant numbers" in the national economy. Thus, plaintiff was not disabled under the "framework of section 204.00 in the Medical Vocational Guidelines. (T. 21).

---

[8] The ALJ found that plaintiff's subjective complaints were not "fully credible," and that he was "limited, but not disabled from all work activity." (T. 19).

[9] Plaintiff's attorney added these limitations to the VE's hypothetical. (T. 60-65). With the additional limitations, the VE testified that there were no jobs the plaintiff could perform. (*Id.*)

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

(1)    The ALJ's finding that plaintiff engaged in SGA after his onset date was not supported by substantial evidence. (Pl.'s Br. at 7-10) (Dkt. No. 9).

(2)    The ALJ erred in affording limited weight to LSCW Dearie's opinions. (Pl.'s Br. at 10-16).

(3)    The ALJ failed to properly develop the record by failing to consult a medical expert regarding plaintiff's Autism diagnosis. (Pl.'s Br. at 16-17).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 14-25) (Dkt. No. 10).  For the following reasons, this court agrees with defendant and will dismiss the complaint.

## DISCUSSION

## I.    Substantial Gainful Activity ("SGA")

### A.    Legal Standards

As stated above, the first step in the sequential evaluation is for the ALJ to determine whether the plaintiff is engaged in SGA.  If so, the plaintiff's claim may be denied without proceeding to any of the subsequent steps.  The regulations specifically state that "[f]irst" the Commissioner will determine whether the claimant is engaging in SGA. 20 C.F.R. §§ 404.1520; 416.920.  "If not," then the Commissioner proceeds to the subsequent steps of the evaluation. *Id.*  As defendant correctly states, the "primary indicator" of SGA is "earnings." (Def.'s Br. at 14-15) (citing 20 C.F.R. § 404.1574(a)(1).

Courts discussing this section of the regulations hold that the existence of such

earnings sets up a presumption that the individual is performing SGA, however, the presumption may be rebutted. *See Clark v. Bowen*, No. 86-1751, 1988 WL 79543, at *9-10 (D. Mass. July 13, 1988) (citing inter alia *Chernicoff v. Richardson*, 400 F. Supp. 448, 453-54 (W.D.N.Y. 1975) (discussing the analysis of the earnings requirement to determine SGA at Step 1)).  The additional considerations to this regulation, cited by plaintiff, provide that the Agency will also consider the sufficiency of the claimant's job performance in order to evaluate SGA. *See e.g.* 20 C.F.R. § 1573 (Pl.'s Br. at 8-9). In *Clark v. Bowen*, the court stated that if the plaintiff submitted evidence demonstrating that he was not engaging in SGA, notwithstanding his earnings, the ALJ must consider and weigh the evidence. *Clark*, 1988 WL 79543 at *9.

### B.    Application

In this case, plaintiff does not question the amount of his earnings.  Rather, plaintiff argues that he meets one of the exceptions to the earning criteria.  Plaintiff cites section 404.1573 which provides that, if the plaintiff is "unable," because of his impairments to do work "satisfactorily," without more supervision or assistance than is usually given to other people who do similar work, then this may show that the individual is not working at the SGA level. (Pl.'s Br. at 8-9) (citing 20 C.F.R. § 404.1573; 416.973).

The ALJ found that plaintiff engaged in SGA between January 1, 2014 until September 30, 2014, without a break in work activity, and determined that none of plaintiff's periods of work constituted an "unsuccessful work attempt." (T. 14)  Even if plaintiff were correct in arguing that the ALJ did not properly determine that plaintiff

was engaged in SGA during the period in question, any such error would have been harmless.  The ALJ did *not* deny plaintiff's benefits at Step 1, based on plaintiff's performance of SGA.  The ALJ stated that "the undersigned will address the remaining steps of the sequential evaluation," but also stated that plaintiff's "work activities after his alleged onset date [would] not be ignored when determining his ability to work." (T. 14).  The ALJ then continued the sequential evaluation all the way to Step Five, including considering the testimony of a VE.  The ALJ's analysis continued as if he had found that plaintiff had not engaged in SGA during the period in question, and instead, considered plaintiff's activities at subsequent steps in the analysis.  Therefore, any error that the ALJ may have made regarding plaintiff's performance of SGA at Step 1 is harmless.

## II.    RFC/Weight of the Evidence

### A.    Legal Standards

#### (1)    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### (2)  Weight of the Evidence

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner. Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

## B.    Application

Plaintiff argues that the ALJ erred in affording only "limited" weight to treating LCSW Dearie in determining plaintiff's RFC. LCSW Dearie began counseling plaintiff in 2014. (T. 541-42). In addition to various contemporaneous treatment "notes,"[10] LCSW Dearie also completed two extremely restrictive "Medical Source Statements," one of which "diagnosed" plaintiff with Listing-level Autism. (T. 543-45 (2/5/15), 548-49 (6/22/15)).[11] LSCW Dearie also completed a third, very brief, Medical Source Statement in February of 2015, which opined that plaintiff's limitations of function had persisted "to the same degree" since August 1, 2012. (T. 546).

As the ALJ correctly noted in his discussion of plaintiff's "severe" impairments at Step 2, LCSW Dearie is not an acceptable medical source for establishing the existence of an impairment,[12] although her opinion may be considered for the effect that

---

[10] Social Worker Dearie's treatment notes consist generally of forms in which boxes have been checked next to symptoms, together with some descriptive sentences written by the counselor. (*See e.g.* T. 537-42, ).

[11] A duplicate June 22, 2015 Medical Source Statement appears at T. 558-59.

[12] The ALJ found that plaintiff's medically determinable severe impairments were depression, dysthymia, bereavement, PTSD, and personality disorder. (T. 14-15). The ALJ did not include

an impairment has on plaintiff's ability to work. (T. 14-15; 20 C.F.R. § 404.1513 (d)(1); 416.913(d)(1)).  In any event, as discussed below, the ALJ did not ignore LSCW Dearie's opinions after finding that she was not an acceptable medical source.  The ALJ fully evaluated LCSW Dearie's opinions at Step 2 and at the subsequent steps in the evaluation, specifically stating why he found that her opinions were entitled to limited weight.

LCSW Dearie's June 22, 2015 Medical Source Statement contains checked boxes, indicating that plaintiff suffers from Listing-level Autism, which, if true, would render plaintiff disabled at Step 3 of the evaluation. (T. 558-59).  The restrictions included in this form are "[q]ualitative deficits in reciprocal social interaction," "[q]ualitative deficits in verbal and nonverbal communication and in imaginative activity," and "[m]arkedly restricted repertoire of activities and interests." (T. 558).  In his discussion of Listed Impairments, the ALJ found that while LCSW Dearie indicated that plaintiff had deficits in verbal and nonverbal communication, other counseling notes[13] "describe [plaintiff] as cooperative with good eye contact, calm and relaxed demeanor, and normal speech." (T. 16, 442).  There is no indication in the record that plaintiff has trouble with his ability to communicate verbally and non-verbally, aside

---

"Autism" as either a severe impairment or a "medically determinable" impairment because LCSW Dearie is not authorized to make such a determination.

[13] The notes cited by the ALJ were written by Kay Hooper, Family and Psychiatric Nurse Practitioner. (T. 443).  However, as discussed below, LCSW Dearie's own counseling notes describe plaintiff as "well-groomed," cooperative, calm, fully oriented with intact thought processes and appropriate thought content." (T. 537, 538, 539, 540).

from the restrictions in his social interaction.[14]

This Autism diagnosis also states that plaintiff had marked restriction of activities of daily living, marked difficulties in maintaining social function, marked difficulties in maintaining concentration, persistence and pace, and had repeated episodes of decompensation each of extended duration. (T. 549). In his Function Report, dated November 12, 2013, even though he stated that he had lost interest in "doing things," and had panic attacks, plaintiff stated that he occasionally played cards, went to the gym a few times per week, cooked, cleaned, ironed, mowed, and went out "daily." (T. 361-69, 364-66). Some of LCSW Dearie's own treatment notes state that plaintiff was well-groomed, cooperative, euthymic, calm, fully oriented, and his thought processes and content were "intact." (T. 537, 538, 539, 540) (Dearie Reports 1/2/15, 8/7/14, 6/9/14, 5/6/14).

On June 19, 2015, three days[15] before LCSW Dearie "diagnosed" plaintiff with Autism, she wrote a report indicating that, although plaintiff was sad and depressed, had a flat or blunted affect, suffered from poor confidence and insight, he was also adequately groomed, cooperative, alert, oriented, and had "intact" memory, attention and language. (T. 555-56). LCSW Dearie also stated that plaintiff's fund of knowledge

---

[14] A review of the hearing transcript, generally, contradicts the opinion that plaintiff has qualitative deficits in verbal communication. Plaintiff was quite articulate at the hearing in his attempt to explain the restrictions imposed upon him by his mental impairments. Although plaintiff agreed with his attorney when he asked plaintiff whether he thought he had trouble "getting his point across," plaintiff had no trouble getting his point across to the ALJ.

[15] In his brief, plaintiff's counsel cites T. 548 and states that LCSW Dearie's Autism Listing diagnosis was dated May 28, 2015. (Pl.'s Br. at 12). The Form begins on T. 548, and the date on the form appears at T. 549. The date appears to be June 22, 2015, not May 28, 2015. (T. 549).

was "average." (T. 556).  The only diagnosis listed in her June 19, 2015 report was "Generalized anxiety disorder." (T. 554).

There is absolutely no evidence in the record that plaintiff had any "episodes of decompensation of extended duration."  Plaintiff worked for much of the time between the alleged onset of disability and the ALJ's opinion.  Plaintiff's two trips to the emergency room were related to fainting and insomnia. (T. 458 (insomnia), 424-32 (fainting)).  LCSW Dearie states that there are "several emergency room visits" due to plaintiff's "physical" inability to do work and due to his near collapse. (T. 549).  A review of the emergency room records cited above does not support the alleged extreme nature of the visits.  On November 26, 2012, plaintiff reported that he had "no psychiatric hospitalizations," and he had never been to the "crisis Emergency Room at Binghamton General Hospital." (T. 440).  In fact, the emergency room record produced after plaintiff had a "near" syncope in June of 2013, indicates completely normal results, even after a battery of testing. (T. 424-32).  Plaintiff was sent home with a Holter Monitor to monitor his heart rate.[16] (T. 425).

In NPP Hooper's November 29, 2012,[17] she found that plaintiff was cooperative,

---

[16] As stated above, at the hearing, plaintiff testified that he went to the ER and was sent home with a heart monitor for the day. (T. 40).  However, plaintiff does not mention the fact that the results of the test were completely normal. (T. 502-503).  The notes from plaintiff's follow-up appointment state that he had a near syncopal episode, but the results of all tests were normal; that there were no episodes since then; and that the episode was probably vasovagal. (T. 500-501).  While a vasovagal episode could occur due to stress, and plaintiff reported that he was under stress, the ER report states that it was his second episode in four days - the first occurred while plaintiff was painting and the second while he was cleaning.  These episodes usually happened when plaintiff's "TM s" were above his head. (T. 424).  It does not appear that these episodes occurred due to stress.

[17] Plaintiff was referred to NPP Hooper for "evaluation for medication management" by his then-counselor Peggy Bright-Berhannan. (T. 442).

with good eye contact; calm, relaxed, and his speech was coherent with normal, rate, quality, and tone. (T. 442). His though processes were logical, organized, and had no tangential quality to his conversation. (*Id.*) He denied impairment of impulse control, he was alert, and his intelligence was rated as "[a]verage to somewhat above." (*Id.*) NPP Hooper assessed plaintiff for various mental impairments, and she diagnosed dysthemia,[18] generalized anxiety disorder, and bereavement.[19] (T. 441-42).

In her discussion of depression, NPP Hooper stated that plaintiff had a history of depression, anhedonia, and a loss of interest in his favorite activities. (T. 441). She also stated that plaintiff reported having a sad mood, was irritable, lonely, had feelings of worthlessness, hopelessness, and guilt "much" and/or "most" of the time." (*Id.*) The court notes that, at that time, plaintiff denied having panic attacks, so that NPP Hooper specifically stated that plaintiff's last panic attack was "a few years ago so he generally does not experience these." (T. 441). She also noted that plaintiff reported playing basketball at the gym of "BCC" and spoke with people there "sometimes." (T. 441). As late as January 2, 2015, plaintiff told LCSW Dearie that he "worked out" at the gym

---

[18] Dysthemia is a mood disorder, characterized by, including, but not limited to, chronically mildly depressed or irritable mood, often accompanied by other symptoms, such as eating or sleeping disturbances, fatigue, poor self esteem, and loss of interest in daily activities. www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms/causes.

[19] The court notes that some of the reports in the record contain a Global Assessment of Functioning ("GAF") score. (*See* T. 442 (NPP Hooper assessing a GAF of 55-60). The GAF is a 100 point scale. A score of 41-50 indicates "serious symptoms," 51-60 indicates "moderate symptoms," 61-70 indicates "some mild symptoms," and 71-80 indicates that if symptoms are present, they are "transient" and "expectable reactions to psycho-social stressors," resulting in "no more than a slight impairment in social, occupational, or school functioning." AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-34 (4th Ed. Text Revision 2000) ("DSM-IV-TR"). The GAF is no longer included in the most recent edition of the DSM. http://jaapl.org/content/42/2/173. The ALJ gave these scores "limited weight." (T. 18).

and found that this "helped" his depression. (T. 537).

Plaintiff was examined by consultative psychologist Dr. Cheryl Loomis on December 2, 2013.  Dr. Loomis noted that plaintiff was "currently employed part time as a substitute teacher, since 12/12." (T. 444).  While Dr. Loomis did diagnose various mental impairments, finding that his affect was dysphoric[20] and somewhat restricted with dysthemic mood, she also noted that his appearance was neat and well-groomed, his speech was "fluent and clear with adequate expressive and receptive language," his thought processes were coherent and goal directed, his sensorium was clear, he was fully oriented, his attention and concentration were "intact," his recent and remote memory skills were "intact," and his cognitive functioning was average. (T. 445-46). These findings are inconsistent with LCSW Dearie's June 2015 Autism diagnosis which described an individual who had "qualitative deficits in verbal and nonverbal communication" and who had a "marked" difficulty maintaining concentration.

On November 17, 2014, plaintiff's primary care physician, Dr. Mala Ashok, M.D. conducted a health maintenance evaluation of plaintiff. (T. 506-510).  Plaintiff's chief complaint was listed as "PHYS and C/O INSOMNIA . . . HAVING TROUBLE STAYING ASLEEP." (T. 506).   Plaintiff reported good health, exercising regularly, and being sexually active. (*Id.*)  In Dr. Ashok's review of systems, she reported "negative" psychiatric findings. (*Id.*)  Plaintiff was not taking any medications, even though he had been evaluated for medication by NPP Hooper in 2012, and he was oriented to person, place, and time, with "normal" mood and affect. (T. 508).  Dr.

---

[20] Dysphoria is a state of feeling uneasy, unhappy, or unwell.

Ashok made similar findings in a report dated in November of 2013. (T. 497-99). Thus, the ALJ's rejection of LCSW Dearie's determination that plaintiff had Autism of Listing severity was supported by more than substantial evidence in the record.

The ALJ proceeded to Steps 4 and 5, assessing plaintiff's RFC and his ability to perform other work in the national economy.  The ALJ carefully evaluated the evidence of record, including LCSW Dearie's findings, Dr. Loomis's consultative report, and the report of Dr. Kleinerman, a non-examining state agency consultant.  In December of 2013, Dr. Kleinerman issued a report after reviewing the plaintiff's medical records. (T. 76-85).  Dr. Kleinerman stated that plaintiff could understand, execute, and remember simple instructions and work-like procedures. (T. 82).  Dr. Kleinerman also found that plaintiff could maintain attention and concentration for at least two hour intervals, is able to sustain a normal workday and work week, maintaining a consistent pace. (*Id.*) Dr. Kleinerman also found that plaintiff could respond appropriately to supervisors and coworkers and would have "no difficulty dealing with the public." (*Id.*)  The doctor also found that plaintiff could adapt to changes in a routine work setting and could use judgment to make simple work-related decisions. (*Id.*)

A non-examining state agency consultant's opinion, such as Dr. Kleinerman's report, may be relied upon when it is supported by other record evidence. *Frey ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012). State agency medical consultants "are qualified experts in the evaluation of disability claims and, as such, their opinions may constitute substantial evidence if they are consistent with the record as a whole." *Swan v. Astrue*, No. 09-CV-486, 2010 WL 3211049, at *5 (W.D.N.Y. Aug. 11, 2010)

(citing Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983)).

The ALJ carefully considered all the various reports and determined that, while plaintiff was more limited than Dr. Kleinerman suggested, he was slightly less limited than he appeared in Dr. Loomis's findings,[21] and much less limited than LCSW Dearie's Medical Source Statements suggested.  LCSW Dearie's April 2015 Medical Source Statement, was inconsistent with her own treatment "notes" and with much of the rest of the record.[22] (T. 543-45).  She stated that plaintiff would be unable to meet competitive standards for maintaining attention, sustaining an ordinary routine, working in the proximity of others, making simple work-related decisions, completing a normal work day, performing at a consistent pace, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, using public transportation, dealing with normal work stress. (T. 544).

LCSW Dearie also checked boxes indicating that plaintiff had a low IQ or reduced intellectual functioning, would be "seriously limited" in his ability to remember work like procedures, carry out very simple instructions, maintain regular attendance, work in coordination with others, ask simple questions or request assistance, accept assistance from others and respond appropriately to criticism from

---

[21] The ALJ rejected Dr. Loomis's determination that plaintiff had "marked limitations" in maintaining a regular schedule and appropriately dealing with stress because these limitations were "contradicted by his broad range of daily activities" and because he worked at the SGA level "after Dr. Loomis rendered her opinion." (T. 17).

[22] The court notes that in LCSW Dearie's February 5, 2015 Medical Source Statement, she opined that plaintiff limitations had existed "to the same degree since at least August 1, 2012." (T. 546).  However, LCSW Dearie had only counseled plaintiff since 2014.  It is unclear how LCSW Dearie made that finding, given that her reports were the most restrictive in the entire record.

superiors, interact appropriately with the general public, and maintain socially appropriate behavior. (T. 544).  LCSW Dearie also checked a box indicating that plaintiff would have "no useful ability to function" in the area of getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (*Id.*)

While it is true that plaintiff has severe psychological impairments, there is nothing in the record indicating that he would be seriously limited in asking questions or remembering or carrying out simple instructions.  It is also unclear how LCSW Dearie determined that plaintiff had a "low IQ or reduced intellectual functioning because there are no intelligence tests in the record, and none are mentioned in any of the reports.[23]  In fact, plaintiff's previous therapist listed one of plaintiff's strengths as "intelligen[ce]." (T. 437).

Plaintiff states that his work after the onset date was temporary, and he was "fired" from his jobs.  Plaintiff argues that this activity demonstrates his inability to maintain permanent employment, rather than his ability to perform other work in the national economy.  However, Dr. Loomis noted that plaintiff had been working as a substitute teacher for more than one year when she examined him. (T. 444).  Plaintiff cites Dr. Loomis's statement that plaintiff has impairments which would significantly interfere with his ability to function on a daily basis as "consistent" with LCSW Dearie's Medical Source Statements. (T. 447).  However, the court notes that the

---

[23] As stated above, plaintiff earned a college degree in Anthropology.  There is nothing in the record to support the opinions on LCSW Dearie's Medical Source Statements, and the ALJ would have been justified in giving her opinion less weight even if she were an "acceptable medical source."

definition of a "severe" impairment at Step 2 is an impairment that "significantly limits" the claimant's ability to perform "basic work activities." *See* 20 C.F.R. §§ 404.1521; 416.921. Dr. Loomis may be stating that her diagnoses reflect a "severe" mental impairment. The ALJ also found that plaintiff had severe mental impairments, but not of disabling severity because he is able to perform other work in the national economy. In any event, the ALJ rejected the "marked limitations" for maintaining a schedule and handling stress, noted in Dr. Loomis's consultative report. (T. 17). The ALJ is entitled to adopt only parts of a functional assessment, if doing so is supported by the record. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

The ALJ also based his opinion on plaintiff's ability to perform a "broad range of daily activities," including helping his mother with various daily tasks, maintaining his home, pursuing a romantic relationship,[24] going to the gym,[25] library, and community center, and finally, continuing to work during the period that he claimed he was disabled. (T. 17, 19, 446, 473, 497, 506, 508, 537-41, 551). The ALJ accounted for plaintiff's "moderate" and "marked" limitations, which were suggested by Dr. Loomis, for social interaction by limiting plaintiff to "simple work activity that entails brief interaction with coworkers and no contact with the public." (T. 17).

---

[24] On November 17, 2014, plaintiff reported to his primary care physician that he was "sexually active." (T. 506). In the same examination, plaintiff's primary care physician stated that plaintiff's mood and affect was "normal" and his psychiatric condition was normal. (T. 508).

[25] On January 2, 2015, LCSW Dearie noted in her report that plaintiff worked out at the gym, and it helped his depression. (T. 537). In the same report, she stated that plaintiff was well-groomed, cooperative, euthemic, calm, fully oriented, and his thought processes and content were intact and appropriate, respectively. (*Id.*) LSCW's comment was that plaintiff was anxious due to the "lack of work at school." (*Id.*) Her treatment plan was to have plaintiff focus on the positive things in life, and "continue to think about other jobs he can apply to." (T. 537).

Plaintiff argues that the ALJ failed to analyze LCSW Dearie's opinion in accordance with SSR 06-3p, which governs the evaluation of individuals who do not qualify as "acceptable medical sources."[26]  Plaintiff argues that the ALJ did not even "acknowledge" the factors in SSR 06-3p. (Pl.'s Br. at 13-16).  These factors include the nature and extent of the relationship between the source and plaintiff; the source's qualifications; the sources area of expertise; the degree to which the source presents relevant evidence to support her opinion; whether that opinion is consistent with other evidence; and any other factors that tend to support or refute the opinion. SSR 06-3p, 2006 WL 2329939, at *2-6 (2006).

In his opinion, the ALJ cited SSR 06-3p in his Step 2 analysis, stating that the Ruling makes clear that only evidence from acceptable medical sources may establish the existence of an impairment. (T. 14).  In addition, the ALJ considered most of the other factors in the Ruling that plaintiff claims the ALJ should have considered. *See Brault v. Commissioner of Soc. Sec.*, 683 F.3d 443, 451 (2d Cir. 2012) (the ALJ does not have to state on the record every reason justifying the decision); *Galiotti v. Astrue*, 266 F. App'x 66, 66 (2d Cir. 2008) (citation omitted) (the Commissioner need not "reconcile every shred of medical testimony"); *Duprey v. Berryhill*, No. 3:17-CV-60, 2018 WL 1871451, at *14 (D. Conn. Apr. 19, 2018) (citing *Brault, supra*).

In this case, the ALJ did discuss the length of time that plaintiff was treated by LCSW Dearie, and the ALJ explicitly described the reasons why he found LCSW

---

[26] The court notes that SSR 06-3p was rescinded, effective March 27, 2017.  82 Fed. Reg. 15263 (Mar. 27, 2017).  However, the Federal Register notice provides that the rescission applies only to claims filed on or after March 27, 2017.  Thus, if applicable, SSR 06-3p applies in plaintiff's case.

Dearie's opinion contradicted by the other medical evidence of record and by her own treatment notes. (T. 18-19).  The ALJ also considered plaintiff's own activities, including his continuing work activity, as evidence contradicting LCSW Dearie's opinion. (T. 19).  Although plaintiff accuses the ALJ of "cherry-picking" evidence which supported the ALJ's determination, he did not do so.  It was the province of the ALJ to resolve the conflicting reports and make a determination that was consistent with the evidence of record. *Veino v. Barnhart*, 312 F.3d at 588 (citing *Richardson v. Perales*, 402 U.S. at 399). *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (the court must defer to the Commissioner's resolution of conflicting evidence). *See also Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (although the ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, the ALJ was entitled to weigh all of the evidence available and make an RFC finding that was consistent with the record as a whole). Thus, the ALJ did consider SSR 06-3p, he resolved conflicts in the record, and his findings were supported by substantial evidence.

## III.   DUTY TO DEVELOP THE RECORD

### A.   Legal Standards

Given the remedial intent of the Social Security statute and the non-adversarial nature of benefits proceedings, an ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record if it is incomplete.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999); *Batista v. Barnhart*, 326 F. Supp. 2d 345, 353 (E.D.N.Y. 2004) (although an ALJ's obligation to develop the record is heightened

where the claimant appears pro se, the duty still exists even where the claimant is represented by counsel during the administrative proceedings); 20 C.F.R. §§ 404.1512 (d), 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). Furthermore, "[t]he duty of an ALJ to develop the record is 'particularly important' when obtaining information from a claimant's treating physician due to the 'treating physician' provisions in the regulations." *Dickson v. Astrue*, No. 1:06-CV-511 (NAM/GHL), 2008 WL 4287389, at *13 (N.D.N.Y. Sept.17, 2008) (citing *Devora v. Barnhart*, 205 F. Supp. 2d 164, 172 (S.D.N.Y.2002)).

In furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to determine disability, and additional information is needed to reach a determination. 20 C.F.R. §§ 404.1512(e), 416.912(e).[27] Although the ALJ must attempt to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79, n. 5 (2d Cir. 1999).

B.    **Application**

Plaintiff argues that the ALJ should have developed the record with respect to LCSW Dearie's "diagnosis" of Autism. (Pl.'s Br. at 16-17). Plaintiff argues that,

---

[27] Effective March 26, 2012, the Commissioner amended these regulations to remove former paragraph (e) and the duty it imposed on ALJs to re-contact a disability claimant's treating physician under certain circumstances. The current regulations apply to plaintiff's case.

instead of rejecting LCSW Dearie's diagnosis, the ALJ should have consulted a medical expert to determine whether plaintiff had the Listed Impairment of Autism.

As stated above, the ALJ properly gave limited weight to LCSW Dearie's Medical Source Statements, including her "diagnosis" of Autism. The limited weight, in part, due to inconsistencies in the Social Worker's own reports. Thus, the ALJ was not presented with "obvious gaps" to fill by developing the record further regarding a diagnosis that was not suggested any where else in the medical record.[28] The ALJ had substantial evidence in the record to properly determine plaintiff's RFC, which was then incorporated into the ALJ's hypothetical to the VE.

**WHEREFORE,** based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and the plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter **JUDGMENT FOR DEFENDANT.**

Dated: June 5, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge

---

[28] As defendant points out, LCSW Dearie's own notes contain only the "primary" diagnosis of "Generalized Anxiety Disorder." (T. 551) (Dearie notes dated 3/28/15).